**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| DARYL PACE, | ) |
| | ) |
| Plaintiff, | ) Case No. |
| | ) |
| v. | ) The Hon. Judge |
| | ) |
| McDONALD'S CORPORATION, | ) |
| | ) |
| Defendant. | ) **JURY DEMANDED** |

## COMPLAINT

DARYL PACE ("Plaintiff" or "Pace"), by and through his undersigned counsels, Cass T. Casper, Esq., and Nicholas M. Bowman, Esq., DISPARTI LAW GROUP, P.A., complains as follows against Defendant McDonald's Corporation ("Defendant" or "McDonald's").

## JURISDICTION AND VENUE

1. Jurisdiction of this Court arises under 28 U.S.C. §§ 1331, 1337 and pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, as amended ("ADA").

2. Supplemental jurisdiction exists over the state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so related to the federal claims in this action as to form part of the same case or controversy.

3. Venue is proper under 28 U.S.C. § 1391 because the events and omissions giving rise to the claims herein occurred in this judicial district, specifically at Defendant's headquarters located at 110 N. Carpenter Street, Chicago, Illinois 60607, and because Defendant maintains its headquarters and regularly conducts business within this judicial district.

## PARTIES

4. Plaintiff Daryl Pace is an adult individual who resides in Southern Pines, North Carolina. Plaintiff was employed by Defendant from March 5, 2024, until his termination on November 4, 2025, as a Director in Defendant's Global Technology department.

5. Defendant McDonald's Corporation is a corporation with its headquarters located at 110 N. Carpenter Street, Chicago, Illinois 60607, and regularly conducts business within this judicial district.

6. At all times relevant to this Complaint, Defendant acted by and through its agents, servants, and employees, each of whom acted within the course and scope of their employment with and for Defendant.

7. At all times relevant to this action, Defendant has continuously employed more than 15 employees and has been an employer within the meaning of the ADA and the IHRA.

## ADMINISTRATIVE PREREQUISITES

8. Plaintiff filed a Charge of Discrimination (Charge No. 440-2025-10206) with the Equal Employment Opportunity Commission ("EEOC") on February 20, 2026, alleging disability discrimination and retaliation based upon the factual allegations alleged against Defendant in this Complaint. The same Charge has been cross-filed with the Illinois Department of Human Rights ("IDHR").

9. Plaintiff received a Notice of Right to Sue from the EEOC on April 21, 2026. This Complaint is being filed within ninety (90) days of Plaintiff's receipt of the EEOC's Notice of Right to Sue.

10. Plaintiff has exhausted all administrative remedies and satisfied all jurisdictional prerequisites for filing suit under the ADA.

11. On April 21, 2026, Plaintiff requested a Notice of Right to Sue from the IDHR with respect to his claims under the IHRA. Plaintiff has not yet received a Notice of Right to Sue from the IDHR.

12. Plaintiff respectfully requests that this Court stay the IHRA counts in this Complaint pending Plaintiff's receipt of a Notice of Right to Sue from the IDHR.

2

## FACTS COMMON TO ALL COUNTS

11. At all relevant times, Defendant was an "employer" within the meaning of the ADA and the IHRA, employing more than fifteen (15) employees.

12. At all relevant times, Plaintiff was an "employee" within the meaning of the ADA and the IHRA.

13. Plaintiff began his employment with Defendant on March 5, 2024, as a Director of Vendor Governance and RCOE in Defendant's Global Technology department.

14. Prior to his direct employment, Plaintiff served as a contractor with Defendant beginning in October 2023, during which time he worked under the direct supervision of James Green ("Green"), Sr. Director of Global Technology, providing Defendant with continuous service in the same functional area from October 2023 through the date of his termination.

15. From Fall 2023, while Plaintiff was still a contractor, Green began orchestrating a campaign of targeted "Sentiment Surveillance" against Plaintiff, directing colleague Kinga Curylo to monitor and report on Plaintiff's professional activities, communications, and sentiments. This surveillance campaign predated Plaintiff's formal employment and continued throughout his tenure, establishing a sustained pattern of targeted hostility toward Plaintiff.

16. Green's targeting of employees was part of a broader pattern of discriminatory conduct within his department.

17. Of the employees identified on a department reorganization "Purge List" orchestrated by Green, including individuals identified as Lundy, Sabapathy, Ibañez, and Quintero, approximately 88% were women, despite an approximately even gender split within the Vendor Management Office ("VMO"). This statistical disparity reflects a pattern of discriminatory targeting based on protected characteristics within Green's department

18. Throughout his employment with Defendant, Plaintiff performed his job duties in an exemplary manner, as evidenced by his annual performance review in March 2025, in which he received the highest available rating of Exceeds Expectations.

19. Plaintiff is diagnosed with Charcot-Marie-Tooth ("CMT") Disease, a progressive hereditary neurological condition that substantially limits one or more major life activities, including mobility, ambulation, and travel.

20. CMT Disease has caused Plaintiff to suffer from foot drop, difficulty walking, and an inability to travel, all of which necessitated workplace accommodations including remote work and the elimination of travel requirements.

21. On or about May 14, 2025, Plaintiff formally submitted an ADA accommodation request to Defendant, supported by physician documentation, requesting remote work and limitation or elimination of travel requirements.

22. At the time Plaintiff submitted his ADA accommodation request, his role as Director of Vendor Governance and RCOE had been performed entirely remotely since the inception of his direct employment on March 5, 2024.

23. Plaintiff's original role card and applicable global job framework did not designate the position as requiring in-person vendor travel, and the role had been classified and operated as remote throughout his entire tenure prior to his accommodation request.

24. Following Plaintiff's accommodation request, Plaintiff's direct supervisor, James Green, Sr. Director of Global Technology, falsely represented to Defendant's ADA team that Plaintiff's role was "vendor-facing" and required in-person travel in order to obstruct and deny Plaintiff's accommodation.

4

25. Green explicitly stated that he was "anti-ADA" and further stated that "once employees go ADA, you can't fire them," demonstrating direct discriminatory animus toward Plaintiff's protected status.

26. During Plaintiff's employment, Green directed Plaintiff and other Directors to bypass self-reporting procedures and manually input inaccurate hours into Defendant's "Ways of Working" study, a corporate data collection initiative designed to assess employee time allocation. Green's direction to falsify this data constituted the manipulation of corporate records in violation of Defendant's own data integrity policies.

27. In a separate act of misconduct, Green emailed Plaintiff the confidential Performance Improvement Plan ("PIP") and associated personnel records of colleague Julie Bryant without authorization, and directed Plaintiff to edit those confidential records. This unauthorized disclosure of personnel data exposed Plaintiff to professional and legal risk and violated Defendant's confidentiality policies.

28. During his employment, Plaintiff reported to appropriate internal personnel evidence of financial irregularities and procurement misconduct, including kickback arrangements involving vendor CapGemini and corruption in the CloudEQ procurement contracting process. These reports constituted protected disclosures within the meaning of the Illinois Whistleblower Act, 740 ILCS 174/1, et seq.

29. On July 10, 2025, Green provided Plaintiff with a positive verbal mid-year review, raising zero written performance concerns.

30. On July 11, 2025, Green unilaterally altered Plaintiff's role to add vendor management duties outside of the applicable global job framework, in a further attempt to manufacture a basis for denying Plaintiff's ADA accommodation.

31. Contemporaneously with Green's July 11 role alteration, Green and Defendant's Human Resources department introduced, for the first time, a demand that Plaintiff's role required two weeks of onsite travel for every ten weeks of work. This travel mandate directly contradicted Plaintiff's physician's medical restrictions, had never been a component of Plaintiff's role during his tenure, and was inserted into the role description for the first time only after Plaintiff submitted his ADA accommodation request; additionally, the introduction of this eleventh-hour travel requirement constituted bad faith participation in the interactive accommodation process, amounting to a "bait and switch" designed to render Plaintiff's medical restrictions incompatible with his job.

32. On July 21, 2025, Plaintiff filed an internal EthicsPoint complaint regarding Green's retaliatory role manipulation.

33. On July 23, 2025, Defendant partially approved Plaintiff's accommodation request, permitting remote work but still requiring two weeks of onsite travel, which was a condition Plaintiff's physician had restricted.

34. On August 15, 2025, Green retroactively fabricated a negative written mid-year performance review for Plaintiff that directly contradicted the verbal review Green had provided five weeks earlier and was inconsistent with Plaintiff's positive performance indicators documented by HR during May 2025 calibration.

35. On August 16, 2025, Plaintiff formally escalated complaints to HR and Defendant's Workplace Investigation Team regarding Green's ADA obstruction, retaliatory feedback manipulation, and surveillance of Plaintiff.

36. The internal investigation into Plaintiff's complaints was fundamentally compromised by a material, undisclosed conflict of interest. The investigation was overseen and substantially influenced

by HR Lead Lane Fraley, who had a prior professional relationship with James Green, having previously worked alongside Green at Walgreens.

37. This undisclosed relationship between the investigating HR official and the subject of the investigation created an inherent conflict of interest that rendered the internal process neither neutral nor independent, and deprived Plaintiff of a meaningful internal remedy.

38. Defendant's failure to ensure a conflict-free investigation constitutes evidence that the process was designed to insulate Green from accountability rather than to genuinely investigate Plaintiff's complaints

39. On August 20, 2025, Defendant placed Plaintiff on involuntary paid investigatory leave.

40. On September 10, 2025, Plaintiff's physician formally documented and restricted all travel due to Plaintiff's CMT Disease, and Plaintiff notified Defendant's leadership of his diagnosis in writing.

41. On September 19, 2025, Plaintiff filed a formal complaint with the City of Chicago Commission on Human Relations ("CCHR"), Case No. 25-E-46, regarding Defendant's disability discrimination and retaliation.

42. On October 8, 2025, Defendant's own Head of Global Talent acknowledged in writing that there were "inconsistencies" in the performance feedback process applied to Plaintiff.

43. On October 14, 2025, Defendant finally granted Plaintiff's full ADA accommodation, restricting all travel.

44. On November 4, 2025, just three weeks after Defendant granted Plaintiff's full ADA accommodation and days after Defendant received notice of Plaintiff's CCHR complaint, Defendant terminated Plaintiff's employment. At the termination meeting, Green cited alleged poor performance, refusal to meet, and a purported confidentiality breach as justifications.

7

45.    The timing of Plaintiff's November 4, 2025 termination was not coincidental. By terminating Plaintiff weeks before the close of the 2025 performance year, Defendant caused the forfeiture of Plaintiff's 2025 annual performance bonus and unvested equity compensation, both of which had been earned through Plaintiff's performance and continued service during 2025 but were scheduled for payment in 2026.

46.    Defendant's strategic use of the termination date to intercept these compensation components constitutes additional evidence of bad faith and resulted in substantial financial harm to Plaintiff beyond his base salary losses.

47.    The Illinois Department of Employment Security subsequently determined that Plaintiff's termination constituted a "no-fault layoff," contradicting Defendant's stated disciplinary justifications.

48.    As a direct result of Defendant's discriminatory and retaliatory actions, Plaintiff has suffered lost wages and benefits, emotional distress, reputational harm, and other damages.

## COUNT I - DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA
(Plaintiff v. Defendant)

35.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

36.    At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102, due to his diagnosed CMT Disease, which substantially limits one or more major life activities.

37.    To make a claim for ADA discrimination, the plaintiff must establish (1) that they suffer from a disability defined in the statute, (2) that they are qualified to perform the essential functions of the job in question, with or without reasonable accommodation, and (3) that they have suffered an adverse employment action because of their disability. *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005).

8

38. Plaintiff's CMT Disease substantially limits his major life activities, including his ability to walk, ambulate, and travel, and requires ongoing workplace accommodations.

39. Despite his disability, Plaintiff was able to perform the essential functions of his position as a Director in Defendant's Global Technology department with or without reasonable accommodation, as demonstrated by his "Exceeds Expectations" annual performance rating in March 2025.

40. Defendant was aware of Plaintiff's disability, as Plaintiff disclosed his condition and submitted a formal ADA accommodation request supported by physician documentation on May 14, 2025.

41. Plaintiff suffered adverse employment actions because of his disability, including: (1) obstruction and delay of his accommodation request; (2) unilateral alteration of his job duties to manufacture a pretext for denying his accommodation; (3) fabrication of a negative performance review following his accommodation request; (4) placement on involuntary paid investigatory leave; and (5) termination on November 4, 2025, which was just three weeks after Defendant finally granted Plaintiff's full ADA accommodation.

42. Defendant's purported reasons for terminating Plaintiff's employment were pretextual and designed to mask disability discrimination, as evidenced by Defendant's own supervisor's anti-ADA statements, the fabricated performance review, and the Illinois Department of Employment Security's subsequent determination that Plaintiff's termination was a "no-fault layoff."

43. As a direct result of Defendant's discriminatory actions, Plaintiff has suffered lost wages and benefits, emotional distress, and other compensatory damages.

## COUNT II - RETALIATION IN VIOLATION OF THE ADA
(Plaintiff v. Defendant)

44. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

9

45. To make a claim for retaliation under the ADA, a Plaintiff must establish that they engaged in a statutorily protected activity and suffered some adverse employment action as a result. *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) ("In order to establish a prima facie case of retaliation, [Plaintiff] must show evidence of: '(1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two.'" (citations omitted)).

46. The ADA prohibits retaliation against individuals who engage in protected activities, including requesting reasonable accommodations and complaining about disability discrimination.

47. Plaintiff engaged in protected activity by, among other things: (1) formally requesting ADA accommodations on May 14, 2025; (2) filing an internal EthicsPoint complaint regarding Green's retaliatory role manipulation on July 21, 2025; (3) escalating complaints to HR and Defendant's Workplace Investigation Team on August 16, 2025, regarding ADA obstruction and retaliatory feedback; and (4) filing a formal CCHR complaint on September 19, 2025.

48. Following Plaintiff's protected activities, Defendant took adverse employment actions against him, including, but not limited to: unilaterally altering his job duties, fabricating a negative performance review, placing him on involuntary paid investigatory leave, and terminating his employment.

49. A causal connection exists between Plaintiff's protected activities and the adverse employment actions, as evidenced by the close temporal proximity between Plaintiff's accommodation request and the subsequent adverse actions, Green's explicit anti-ADA statements, and the pattern of retaliatory conduct that culminated in Plaintiff's termination just three weeks after his full accommodation was finally granted.

50. As a direct result of Defendant's retaliatory actions, Plaintiff has suffered lost wages and benefits, emotional distress, and other compensatory damages.

10

## COUNT III - DISABILITY DISCRIMINATION IN VIOLATION OF THE IHRA
(Plaintiff v. Defendant)

51. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

52. IHRA, 775 ILCS 5/1-101 *et seq.*, prohibits discrimination in employment based on disability.

53. To present a prima facie case of discrimination under the IHRA, the plaintiff "must show that: (1) she is a member of a protected class; (2) she was performing satisfactorily; (3) she was discharged despite the adequacy of her work; and (4) a similarly situated employee who was not a member of the protected group was not discharged." *Powell v. City of Chi. Human Rights Comm'n*, 389 Ill. App. 3d 45, 53 (2009).

54. Plaintiff is disabled within the meaning of the IHRA because he suffers from CMT Disease, a progressive hereditary neurological condition that substantially limits one or more of his major life activities.

55. At all times relevant to this action, and despite his disability, Plaintiff was able to perform the essential functions of his Director position with or without reasonable accommodation, as evidenced by his "Exceeds Expectations" annual performance rating in March 2025.

56. Defendant terminated Plaintiff because of his disability; thus, Defendant violated the IHRA's prohibition on disability discrimination.

57. Defendant did not terminate a similarly situated employee who was not disabled or who did not request ADA accommodations.

58. As a direct result of Defendant's discriminatory actions, Plaintiff has suffered lost wages and benefits, emotional distress, and other compensatory damages.

## COUNT IV - RETALIATION IN VIOLATION OF THE IHRA
(Plaintiff v. Defendant)

59. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

60. "In order to establish a prima facie case of retaliation under the Human Rights Act, petitioner must show that: (1) she was engaged in a protected activity; (2) her employer committed a material adverse act against her; and (3) a causal nexus existed between the protected activity and the adverse act." *Hoffelt v. Illinois Dept. of Human Rights*, 367 Ill. App. 3d 628, 634 (2006).

61. The IHRA prohibits retaliation against individuals who engage in protected activities, including requesting reasonable accommodations and complaining about disability discrimination.

62. Plaintiff engaged in protected activity by requesting reasonable accommodations for his disability, filing an internal EthicsPoint complaint regarding Green's retaliatory role manipulation, escalating complaints to HR and Defendant's Workplace Investigation Team regarding ADA obstruction, and filing a formal CCHR complaint on September 19, 2025.

63. Following Plaintiff's protected activities, Defendant took adverse employment actions against him, including, but not limited to, fabricating a negative performance review, placing him on involuntary paid investigatory leave, and terminating his employment.

64. A causal connection exists between Plaintiff's protected activities and the adverse employment actions, as evidenced by the temporal proximity and pattern of retaliatory conduct.

65. As a direct result of Defendant's retaliatory actions, Plaintiff has suffered lost wages and benefits, emotional distress, and other compensatory damages.

## COUNT V – RETALIATION UNDER THE ILLINOIS WHISTLEBLOWER ACT
(Plaintiff v. Defendant)

66. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

67. The Illinois Whistleblower Act, 740 ILCS 174/1, et seq., prohibits an employer from retaliating against an employee who discloses information that the employee reasonably believes constitutes a violation of a state or federal law, rule, or regulation to a person with authority to investigate, police, or correct the violation. *See* 740 ILCS 174/15(c).

68. During his employment, Plaintiff disclosed to appropriate internal personnel information that he reasonably believed constituted violations of law, including evidence of kickback arrangements involving vendor CapGemini and corruption in the CloudEQ procurement contracting process. These disclosures constituted protected activity within the meaning of the Illinois Whistleblower Act.

69. Following Plaintiff's protected disclosures, Defendant subjected Plaintiff to materially adverse employment actions, including the retroactive fabrication of negative performance documentation, placement on involuntary paid investigatory leave, and termination of his employment.

70. A causal connection exists between Plaintiff's protected disclosures and the adverse employment actions taken against him, as evidenced by the pattern of escalating retaliatory conduct following his reports and the close temporal relationship between his disclosures and the adverse actions.

71. As a direct result of Defendant's retaliatory actions, Plaintiff has suffered lost wages and benefits, emotional distress, and other compensatory damages.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendant, and order the following relief: (1) Back pay, front pay, lost wages, benefits, and all other compensation lost as a result of Defendant's unlawful conduct; (2) Compensatory damages for emotional distress, mental anguish, physical manifestations of stress, and other non-pecuniary losses in an amount to be determined at trial; (3) Reimbursement for medical expenses and other out-of-pocket expenses incurred as a result of Defendant's discriminatory conduct; (4) pre-judgment and post-judgment interest at the highest rates allowed by law; (5) special damages, specifically stated pursuant to Federal Rule of Civil Procedure 9(g), for tax penalties and early withdrawal penalties incurred as a result of Plaintiff's

forced early withdrawal from his 401(k) retirement account, which was necessitated by the loss of employment income caused by Defendant's unlawful conduct; and (6) reasonable attorneys' fees and costs incurred in this action; and (6) such other and further relief as this Court deems just and proper.

<strong>JURY DEMANDED ON ALL COUNTS</strong>

Respectfully submitted,

**DARYL PACE**

*/s/ Cass T. Casper*
By:_____
One of Plaintiff's Attorneys

*Nicholas M. Bowman, Esq.*
DISPARTI LAW GROUP, P.A.
121 W. Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 525
E: nick.bowman@dispartilaw.com

*Cass T. Casper, Esq.*
DISPARTI LAW GROUP, P.A.
121 W. Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 331
E: cass.casper@dispartilaw.com